UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| In Re: | Case No.: | 21-19296-ABA |
|---|---|---|
| Tyrelle Lamar King, | Chapter: | 13 |
| Debtor. | Judge: | Andrew B. Altenburg, Jr. |
| | Hearing Date: | June 21, 2022 |

**MEMORANDUM DECISION**

## I.    INTRODUCTION

The debtor filed a chapter 13 bankruptcy case with the goal to cram down a property tax lien. The lien concerned real property that the debtor became a co-owner of after a complaint to foreclose the equity of redemption had been filed. He filed this bankruptcy case just days before summary judgment was entered in the state court. The plaintiff in the foreclosure matter quickly filed a Motion for Relief from Stay, Dismissal, and/or for Sanctions here. This court now decides that dismissal of the case is appropriate due to the debtor's lack of good faith and inability to propose a feasible plan. In addition, because stay relief would otherwise have been merited, the debtor would not have been able to confirm a plan.

## II.    JURISDICTION AND VENUE

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a), (b)(1)(G), and the Standing Order of the United States District Court dated July 23, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 362 and 1307.

Pursuant to Fed. R. Bankr. P. 7052, the court issues the following findings of fact and conclusions of law.

### III.    BACKGROUND

In July 2019, Greta King, the grandmother of the debtor, Tyrelle Lamar King,[1] purchased property located at 1300 Decatur Street, Camden, New Jersey (the "Decatur Property") from Ashante Johnson for $1. Doc. No. 12, ex. C (deed); Doc. No. 23, p.2 (Tyrelle through counsel reciting that Johnson purchased the property for $1,500 and two years later sold it to Greta). The property was already in property tax arrears and subject to a tax sale certificate sold to the City of Camden back in June 2011. Doc. No. 12, ex. B. In June 2021, the City of Camden assigned the certificate to Anedia Henriquez for $9,000, which was less than the amount then owed. *Id.*, ex. D. In July 2021, Ms. Henriquez filed a complaint against Greta and subsequent lienors to foreclose the equity of redemption, and recorded a *lis pendens*. *Id.*, ex. E. In August 2021, Greta transferred title to the Decatur Property from herself to herself and Tyrelle for $1 by quitclaim deed prepared by attorney Charles Izzo. *Id.*, ex. G.[2] The transfer was recorded in September 2021. *Id.* The state court entered summary judgment in Ms. Henriquez's favor on December 3, 2021, stating that Greta had not presented a valid defense to the foreclosure action. Doc. No. 46, ex. B. Just two days before, Tyrelle filed this chapter 13 bankruptcy case, represented by Mr. Izzo.

Other than the property tax claim, Tyrelle's schedules disclosed just $4,107 in claims, all unsecured. Doc. No. 1. Tyrelle added no other creditors in his case. Ultimately, unsecured creditors filed $5,051 in claims. *See* Claims Register. Tyrelle first proposed a chapter 13 plan paying $441 per month for 60 months. Doc. No. 3. He would cram down Ms. Henriquez's claim to the $19,000 value he assigned to the Decatur Property, plus statutory interest of 18%, *see* 11 U.S.C. § 551, for a total of $25,000. A scheduled $2,576 claim of the Bergen Square Community Development (later identified as also holding a tax sale certificate on the Decatur Property) would not be paid at all. The City of Camden would receive $1,000 on a secured claim. The City filed a claim in error that it later withdrew. *See* Claim #7.[3] Unsecured creditors would be paid 100 percent.

Tyrelle later modified this plan to pay $720 per month for the remaining 57 months, for a total of $42,363 (three months at $441 plus 57 months at $720). Doc. No. 29. The explanation provided was so that the plan was essentially "modified to agree with appraisal of collateral." *Id.* p.9, Part 9. The value assigned to the collateral was $35,000. *Id.* p.5. Under the modified plan, Tyrelle proposed to pay a total of $39,000 on Ms. Henriquez's claim. *Id.* Unsecured creditors now would only receive *pro rata* payments from any remaining funds. *Id.* p.6, Part 5.

---

[1] Due to several King parties, the court hereafter will refer to each by their first name.

[2] As the deed did not indicate how the property was conveyed, Tyrelle took as a tenant in common with Greta. N.J.S.A. 46:3-17.

[3] As will be explained in the Procedural History below, the City's claim was preserved through this Court's Order of June 2, 2022, Doc. No. 52, wherein the City and Ms. Henriquez "agreed that Ms. Henriquez shall receive a refund for the amount paid for the assignment plus lawful interest and additional costs with the remainder of the redemption moneys being paid to the City in accordance with *N.J.S.A.* 54:5-114.8." *Id.* In its letter attached to the Order, the City offered to file a proof of claim to memorialize this agreement however, the court believes that the Order and letter preserve the City's claim and/or certainly serves as an informal proof of claim. *See In re Kern*, 20-18381-ABA, 2020 WL 7066327, at *2 (Bankr. D.N.J. Dec. 2, 2020) *citing In re Roper & Twardowsky, LLC*, 15-32878 (SLM), 2017 WL 3311222, at *7–8 (Bankr. D.N.J. July 5, 2017) (J. Meisel).

Tyrelle proposed to pay $720 per month despite disclosing $1,467 in net monthly income on Schedule s I/J. *See* Doc. No. 1, p. 28. As of the date of this Opinion, Tyrelle is behind on trustee payments by $213, having not paid in June or July. But the chapter 13 trustee's website has not updated to show the proposed increased monthly payment starting in Month 5. Taking this into account, Tyrelle is behind by $1,050.

The increase in plan payment certainly resulted from an appraisal Tyrelle simultaneously filed with the amended plan, estimating the value of the Decatur Property at $35,000. *See* Doc. No. 31. The appraisal of the three-bedroom,[4] one bath house shows a boarded-up, fenced-in property in poor condition. *See id.* According to Tyrelle, nobody lives in the Decatur Property: he, Greta, his uncle, Walter, and a cousin live together elsewhere in Camden. Doc. No. 46, ex. C, p. 21. Indeed, the appraiser remarked that "Major repairs are necessary at the time of inspection," Doc. No. 31, p. 5, and Tyrelle himself noted on his Schedule A/B that the property was in "disrepair," a description he did not change when later amending that schedule. Doc. No. 1, p. 10; Doc. No. 48, p. 1.

Ms. Henriquez took a deposition of Tyrelle on April 11, 2022, that revealed several discrepancies in Tyrelle's disclosures and certifications and a lack of knowledge about the Decatur Property. Doc. No. 46, ex. C. Tyrelle testified that he had attended college but did not graduate. *Id.*, p. 8. He works in the warehouse of a Target Distribution Center making $23.50 an hour, working 40 hours weeks. *Id.*, p. 10. Regarding a creditor listed on his petition, South Jersey Auto Finance, he said he did not know he owed it any money. *Id.*, p. 12. He admitted he is not actually paying several of the expenses he disclosed on his Schedule I/J, a difference of $657. *Id.*, pp. 9-14. Before filing for bankruptcy, nobody was suing him for any reason. *Id.*, p. 12. Despite listing debts of $200 owing to four different municipalities, Tyrelle testified that he only owed one.[5] *Id.*, p. 13. He has been able to pay his bills on time as they came due. *Id.*, p. 13. Regarding Covid, Tyrelle testified that he had just recovered from having the virus and had not had it before. *Id.*, p. 13. The Covid crisis did not affect him financially; did not stop him from paying his bills. *Id.*, p. 14. Tyrelle does not pay rent, property taxes or utilities living with Greta, and pays for repairs only "when necessary." *Id.*, p. 9.

As for the Decatur Property, Tyrelle testified that it was Greta's idea for him to purchase half of the property. *Id.*, p. 19. The deed was presented to him at Mr. Izzo's office with Walter present. *Id.*, p. 20. Walter paid Mr. Izzo for the deed preparation. *Id.* Asked whether he got a title search done before taking the deed, Tyrelle said he did not know what that was. *Id.*, p. 21. He did not know that a foreclosure was pending at the time. *Id.*, p. 21. He could not remember when he bought his interest in the Decatur Property. *Id.*, p. 15. He had only visited the property "maybe twice," and only after he had already become a co-owner. *Id.*, pp. 15-16. He had never been inside the property. *Id.*, p. 17. He had "no clue" of the value of the property when he bought it. *Id.*, p. 16. He did not inquire about the value or whether there were liens on the property, he "didn't even know there were liens on the property." *Id.*, p. 16. He could not recall when he learned that there were liens on the property and did not know how much was owed on the property at the time of

---

[4] The appraisal's photographs only show two bedrooms, but the appraisal claims three.

[5] Interestingly, no municipality filed a proof of claim despite having received notice of the case and a deadline to file its proof of claim. *See* Doc. No 7 and Claims Register.

the deposition. *Id.* He could not confirm that more was owed on the property than it is worth. *Id.*, p. 17. He did not know whether there was insurance on the property or whether the current taxes had been paid. *Id.*, p. 18. He stated that his uncle, Walter, takes care of maintenance, expenses and taxes there. *Id.*, p. 14. Tyrelle does not pay any expenses connected with the Decatur Property. *Id.*, p. 15. He does not even know what expenses there are for the property. *Id.* Tyrelle stated for the first and only time in this case that he wants the Decatur Property for himself and the son he is expecting. *Id.*, p. 18. Yet when asked why he thought this property was an opportunity despite only having seen it twice, he answered "I'm not sure." *Id.*, p. 19.

Tyrelle testified that he considered filing for bankruptcy even before he bought the property. *Id.*, p. 22. He did so due to "outstanding bills and all so I wanted to build my credit score up." *Id.*, p. 22. Mr. Izzo told him filing bankruptcy would help his credit score. *Id.*, p. 22. Tyrelle denied that filing bankruptcy was part of the plan in his buying the Decatur Property. *Id.*, p. 22.

The court found this exchange revealing:

Q. Would you agree that buying a property with over $50,000 in tax liens on it pretty much increased your debt by over 10 times?
A. You said what happened?
Q. Before you filed bankruptcy you owed people maybe $4,000, right?
A. I'm not sure about that number but I know it was money though.
Q. How much do you think you owed people when you filed bankruptcy?
A. I'm not sure. I had debts that I didn't even fully know about.
Q. So now you bought a property and increased your debt load by over $50,000, is that correct?
A. I'm not sure.
Q. Whose idea was it for you to file bankruptcy?
A. It was my idea.
Q. But didn't you say your uncle also had something to do with that?
A. No, I never said that.
Q. How much did you agree to pay Mr. Izzo for filing bankruptcy?
A. I didn't really discuss the matters of the money, I let my uncle handle that.

* * *

Q. Is there a fee agreement that you signed by which you agree to pay [Mr. Izzo]?
A. I'm not sure what exactly that is.
Q. Do you owe Mr. Izzo any money?
A. No.
Q. Have you paid Mr. Izzo any money?
A. I haven't but my uncle may have.
Q. Has anyone else paid him for you?
A. Yes.
Q. Who else has paid him for you?
A. My uncle.
Q. When did you first learn about the foreclosure?

A. I'm still figuring this stuff out. I'm not even really too sure about a foreclosure or anything like that. I'm figuring this out as the days go on.

Q. So, if I understand correctly, this idea of you filing bankruptcy for this property was your  uncle's idea?

A. No, the bankruptcy wasn't filed for the property purposes, it was for filed for my own personal reasons, like credit score, like I said, and also just a brand new fresh restart.

Q. But you indicated to me you were able to pay all of your bills as they came due, right?

A. You said what happened? The ones that I was aware of, yes, the ones I was aware of, yes.

Q. Who first told you about the foreclosure against 1300 Decatur?

A. I'm unaware of a foreclosure, I wasn't sure about that.

Q. When did you first learn about it?

A. After coming to the office here and speaking with Izzo.

Q. Who told you about the foreclosure?

A. Izzo.

*Id.*, pp. 23-25.

This deposition occurred four months after Tyrelle had filed the bankruptcy case.


## IV. PROCEDURAL HISTORY

Within days of the bankruptcy filing, Ms. Henriquez filed a Motion for Stay Relief, Dismissal and/or for Sanctions. Doc. No. 12 (the "Stay Relief Motion"). She alleged that Tyrelle filed his chapter 13 bankruptcy case in bad faith to thwart the foreclosure of the tax sale certificate owned by her. She alleged that the chapter 13 plan was not proposed in good faith as the unsecured creditors could be paid in full in three months. She argued that cause existed for vacating the stay as to her foreclosure action because the property secured by her tax sale certificate had no equity and, as the debtor did not live there, was not necessary for reorganization. She alleged that the transfer of the deed constituted a fraudulent transfer intended to delay the foreclosure action, supporting dismissal of the case. Her proposed order sought stay relief and reimbursement of her attorney's fees and costs as a sanction to make the creditor whole.

In response, Mr. Izzo filed a brief accusing Ms. Henriquez of Malicious Abuse of Process for making allegations without any supporting evidence, citing *Lobiondo v. Schwartz*, A-4325-04T5, 2007 WL 2188600, at *3 (N.J. Super. Ct. App. Div. Aug. 1, 2007), *aff'd in part as modified, rev'd in part,* 199 N.J. 62 (2009). Doc. No. 15. Regarding Ms. Henriquez's statement that that the property was transferred for no value, Mr. Izzo cited a New Jersey statute exempting transfers between parents and their children from New Jersey's Realty Transfer Fee. *Id.* Neither of these arguments were responsive to the Stay Relief Motion, as *Lobiondo* defined malicious abuse of process as a cause of action requiring a showing "'that the litigator perform[ed] further acts *after the issuance of process* which represent the perversion or abuse of the legitimate purposes of that process[,]'" *Lobiondo v. Schwartz*, at *3 (quoting *Penwag Prop. Co., supra,* 148 N.J. Super. at

499, 372 A.2d 1162) (emphasis added)), and Ms. Henriquez had complained about the amount Tyrelle paid to purchase the property, not whether a realty transfer fee had been paid. The statute cited did not even apply to the transaction as Greta and Tyrelle's relationship is of grandmother/child, not parent/child. Granted, Mr. Izzo had independently certified that Greta had adopted Tyrelle as her son, Doc. No. 15, but Tyrelle refuted that in a later submission. *See* Doc. No. 40, p. 2, n. 1.

Mr. Izzo concluded his brief with the following:

Debtor has presented admissible evidence in the form of the appended *Declarations of the Slandered Parties*, declared under penalty of perjury, which unequivocally refute the maniacally absurd and frivolous allegations set forth in Creditor's moronic argument based exclusively upon speculation and conjecture in the absence of a single shred of evidence. The Court may take judicial notice of the Creditor's moronic lust to acquire a windfall by any method of demented skullduggery conceivable in the baseless, liable, and slanderous content of Creditor's brief not supported by a single shred of proffered evidence and dismiss Creditor's frivolous argument for lack of supporting evidence.

WHEREFORE, for the foregoing reasons Debtor respectfully requests this Honorable Court to enter a judgment dismissing Creditors [sic] motion as having been submitted in Bad Faith for purposes of delay and distraction in a misguided effort to contaminate judicial process to obtain an objective not intended by law.

Doc. No. 15, p. 7. In addition to the inappropriateness of the language utilized by Mr. Izzo, the court notes that the lack of equity is evidenced by the $76K claim exceeding the $19K value[6] originally asserted by Mr. Izzo's client at the time, thus Mr. Henriquez did not fail to present evidence, and it is the debtor's burden to prove that the property is necessary to an effective reorganization. *See* 11 U.S.C. § 362(g).

The response attached "declarations" of Greta, Tyrelle and Mr. Izzo. Greta declared that:

My decision to provide my biological grandson with a percentage of my property was based upon the impact of COVID 19 raising concerns of Wills and Heir Property Distribution in the wake of such a deadly pandemic and was not in any manner influenced by any existing foreclosure or bankruptcy proceedings.

Doc. No. 15, p. 9.[7]

---

[6] Or even the $35K value set forth in the modified plan.

[7] As mentioned above, as the deed did not state indicate how the property was conveyed, Tyrelle took as a tenant in common with Greta. N.J.S.A. 46:3-17. Thus, upon Greta's death, Tyrelle would not own the entire property, but Greta's interest would devolve to her heirs, who would own the property with Tyrelle. *Weiss v. Cedar Park Cemetery*, 240 N.J. Super. 86, 98 (App. Div. 1990).

In contrast to later deposition testimony regarding the lack of impact on him of Covid, Tyrelle declared:

> My decision to file for Chapter 13 was done in Good Faith after my financial stability was seriously impacted following the COVID 19 pandemic which is currently governed by the intent and purposes of congress [sic] under the provisions of Section 1113 of the CARES Act. My motive for filing this matter at this interval is to enjoy the added benefits of these provisions, which will sunset, or expire, on March 26, 2022, unless extended again.

*Id.*, p. 10.

Mr. Izzo's declaration merely repeated Tyrelle's statement. *Id.*, p. 11. Mr. Izzo had referenced the CARES Act amendment in his brief, stating that the purpose of the CARES Act was both to "expedite bankruptcy processes" and to allow chapter 13 debtors to *extend* (i.e., not expedite) plans to up to seven years. *Id.*, p. 7. Notably, none of Tyrelle's proposed chapter 13 plans sought seven-year terms.

Ms. Henriquez replied, pointing out that nothing in the debtor's response refuted cause for relief from the stay or the allegation that the transfer of ownership constituted a fraudulent transfer to delay a creditor. She also argued that Tyrelle cannot redeem the tax sale certificate unless he intervened in the state court action, as only parties to the foreclosure action may redeem. Doc. No. 16.[8] Moreover, Ms. Henriquez argued that Tyrelle cannot obtain cramdown relief against Ms. Henriquez without Greta's participation, citing 11 U.S.C. § 524(e) (discharge "does not affect the liability of any other entity, or the property of any other entity for, such debt."). Ms. Henriquez later conceded that the Bankruptcy Code would allow Tyrelle to cram down her claim, see Doc. No. 46, p. 7, though she argued that it would be an abuse of the bankruptcy provisions to do so.

Ms. Henriquez also filed an objection to Tyrelle's plan, asserting that neither it nor the petition were filed in good faith, that the plan does not meet the best interest of creditors test, and

---

[8] This is not entirely correct. New Jersey law provides that:

all persons claiming an interest in or an encumbrance or lien upon such property . . . which . . . could be recorded . . . and which shall not be so recorded . . . at the time of the filing of the complaint . . . shall be bound by the proceedings in the action so far as such property is concerned, in the same manner as if the person had been made a party to and appeared in such action, and the judgment therein had been made against the person as one of the defendants therein[.] [S]uch person, upon causing such conveyance. . . may apply to be made a party to such action. No person, however, shall be admitted as a party to such action, nor shall the person have the right to redeem the lands from the tax sale whenever it shall appear that the person has acquired such interest in the lands for less than fair market value after the filing of the complaint, except where such transferee is related by blood or marriage to, or who, because of other close or personal relationship with the transferor, would in normal course be a party to an instrument for little or no consideration, or where such party acquired his interest at a judicial sale.

N.J.S.A. 54:5-89.1.

Thus, not having a recordable interest as of the filing of the state court complaint, Tyrelle would yet be bound by any judgment entered so far as the property is concerned. Being Greta's grandson, "related by blood," he can redeem despite having received the property interest for little or no consideration.

that it fails to pay her secured claim in full or all projected disposable income, priority taxes such as postpetition real estate taxes in full, the tax claim at its state law interest rate pursuant to 11 U.S.C. § 511, and her wholly-secured claim in full. Doc. No. 20. Some of these objections are incorrect: As the debtor has no assets available for liquidation, the plan could not fail the best interest of creditors test, and Tyrelle *did* propose to pay the tax claims at their state law interest rate.

The subsequently-filed modified plan did not cure any of the valid objections. *See* Doc. No. 29.

Mr. Izzo's reply brief to the Stay Relief Motion on behalf of his client began with wondering why Ms. Henriquez was "alarmed" at a plan that proposed "to redeem a certain secured lien in full . . . ." Doc. No. 23, p. 2. He concluded without specifics that Tyrelle had demonstrated that he could "facilitate a very orderly predictable and *full* redemption of the subject lien." *Id.* (emphasis added). But Tyrelle *never* in any of his plans proposed to pay the lien in full, but instead, to cram it down.

Mr. Izzo then continued to recite the history of holders of tax liens on the Decatur Property, seeming to find significant that an earlier holder had also been the client of Ms. Henriquez's attorney, but not explaining why. He stated that Tyrelle had "testified that he joined his Grandmother on the Deed in an effort to fortify her finances and to finally facilitate a redemption of the now 20 year old City Tax Lien. . . ." *Id.*, pp. 2-3. As Tyrelle had not testified in court, and his deposition occurred later, the court assumes the testimony referred to occurred at the section 341 hearing. But Mr. Izzo did not attach a transcript of that hearing or have his client certify the statement, therefore the assertion is hearsay. Yet if true, it would mean that Tyrelle sought to "fortify" Greta's finances at the same time that he alleged he was suffering serious financial repercussions due to Covid, and it conflicts with Greta's certification that she transferred the property for estate-planning purposes and Tyrelle's later testimony that he wanted the property as a place to live with his son.

Mr. Izzo complained that Ms. Henriquez had no seeming connection to the property, but "voluntarily [came] forward and insert[ed] herself as a 'bidder,'" thereby becoming a creditor in this matter, but did not explain why that was relevant or recognize that the same could be said of Greta and Tyrelle. *Id.*, p. 4. He characterized Ms. Henriquez's claim as a "windfall" since she obtained the tax sale certificate for only $9,000 when that the claim had reached $70,000 by the time of her purchase. *Id.* But upon redemption, Ms. Henriquez is only entitled to receive her investment plus interest and costs. N.J.S.A. 54:5-60. Mr. Izzo asserted that his client's proposal to pay $35,000 plus interest was fair since it "is far in excess of the moving party's $9,000[] direct investment" and would "provide for full reimbursement . . . along with all interest earned by her after the assignment and full payment of all fees and costs allowed to be recovered under New Jersey law and Bankruptcy Law." *Id.*, p. 5.

Mr. Izzo then cited N.J.S.A. 54:5-54.1 as providing that the amount required to redeem a tax lien certificate is to be determined by the tax collector or pursuant to bankruptcy law, arguing then that this court must ignore the proof of claim and independently determine what is to be paid to Ms. Henriquez and what to the City of Camden. *Id.*, p. 5. This is incorrect. The cited statute

provides that *"[a]ll redemptions* shall be made through the tax collector's office, unless authorized by court order or pursuant to federal bankruptcy law." N.J.S.A. 54:5-54.1 (emphasis provided). It states nothing about who determines the amount of the redemption.

Mr. Izzo then argued that a secured creditor seeking *in rem* relief on the theory that the debtor exhibited a lack of good faith as part of a scheme to hinder, delay and defraud must meet a "substantial evidentiary burden," citing a case discussing 11 U.S.C. § 362(d)(4). Doc. No. 23, p. 6; *see In re O'Farrill*, 569 B.R. 586 (Bankr. S.D.N.Y. 2017). But Ms. Henriquez did not proceed under section 362(d)(4). Indeed, subsection (d)(4) concerns transfer of ownership or interest in property "without the consent of the secured creditor or court approval." 11 U.S.C. § 362(d)(4)(A). Ms. Henriquez never alleged that she or a court had to approve any transfer of ownership.

Mr. Izzo continued on to concede that bad faith in filing is a basis for granting relief from the stay, and that the party requesting relief need only show lack of equity in property while the party opposing relief has the burden of proof on all other issues, citing 11 U.S.C. § 362(g). He then posited that the filing of an unconfirmable plan might support bad faith and quoted the entirety of section 1325 of the Bankruptcy Code setting forth the requirements for confirming a chapter 13 plan. He followed this with a listing of factors a court must consider. The brief then ended without any application of the facts of this case to the law to meet the debtor's burden.

A plenary hearing on the Stay Relief Motion set for March 3, 2022 was adjourned by the court indefinitely after receiving a statement from Ms. Henriquez's counsel that neither Tyrelle nor Greta had complied with his subpoenas for depositions and Mr. Izzo advised this court that he had a 341 meeting of creditors in the Trenton courthouse scheduled for the same day and time.[9] The court relisted the motion on Ms. Henriquez's request on April 18, 2022 for a hearing on April 26, 2022.

On April 26, the court received a Supplemental Certification of Tyrelle, stating that he was filing this certification "on my own cognizance, without the assistance and/or knowledge of my counsel in this matter." Doc. No. 40, p. 1. There, Tyrelle denied that he and his grandmother engaged in a civil conspiracy to defraud, but instead averred that Greta exercised a legal right to contract as allowed by 42 U.S.C. § 1981; accused Ms. Henriquez's attorney of falsely certifying in an Amended Complaint filed in state court that a title search he performed prior to filing the amended complaint had shown only Greta's ownership, *id.*, p. 2, n. 2; *see id.*, ex. A, p. 9[10]; and

---

[9] In its March 3d docket entry adjourning the matter, the court noted "The court also puts the parties on notice that it believes a plenary hearing scheduled by the court takes priority over a 341 meeting of creditors absent a showing to the contrary."

[10] That attorney denied that a subsequent title search included Tyrelle's interest. Doc. No. 28, ¶ 10. He offered to produce the title report on request. *Id.* Nobody has made such a request.

Because Tyrelle's interest was not recorded at the time of the filing of the original complaint (having not been transferred yet), it appears he would be bound by the state court action regardless of whether named in the amended complaint, as New Jersey law provides that:

> In any action to foreclose the right of redemption in any property sold for unpaid taxes or other municipal liens, all persons claiming an interest in . . . such property, by or through any conveyance . . . which, by any provision of law, could be recorded . . . in any public office in this State, and

alleged that Ms. Henriquez's attorneys cited case decisions inapplicable to this matter because they involved foreclosure of a mortgage and the rights of an owner delinquent in property taxes.[11] He alleged that Ms. Henriquez is not a bona fide purchaser of the tax sale certificate (despite the state court having implicitly decided her standing), that he "was bullied and harassed into being deposed," and, without any supporting factual allegations, that as he is a person of color, Ms. Henriquez's attorneys have engaged in discriminatory conduct in trying to deny him the right to reorganize in bankruptcy, the right to contract (citing 42 U.S.C. § 1981) and the right to property (citing 42 U.S.C. § 1983). In closing, he complained that Ms. Henriquez and her attorney were falsely claiming that he and his grandmother were engaged in civil and criminal conspiracy while they were "concealing their own unclean hands upon tampering with and fabricating evidence along with perjury in the State Court Action upon [Ms. Henriquez's attorney] annexing a false title certification" to the Amended Complaint regarding the title search. *Id.*, p. 4, ¶ 9.

Ms. Henriquez filed a proof of claim for $76,454, secured by the Decatur Property. Claim No. 2-1. Mr. Izzo filed a "Motion to Reduce Claims" but did not include a certification or legal brief with this motion, attaching only a New Jersey Supreme Court decision, the proof of claim, a copy of N.J.S.A. 54:5-54.1 (providing that redemption of taxes may be made pursuant to federal bankruptcy law), and a proposed order disallowing the claim, striking it from the register, but granting 30 days to file an amended proof of claim. Doc. No. 32.[12] A Notice of Motion stated that the debtor was objecting to the allowance of Ms. Henriquez's claim "on the grounds that the claim is not properly calculated and overstates the amount of the Debt [sic] owed to the creditor." *Id.*

In Ms. Henriquez's response she pointed out that the "objection" could not be challenging the amount to redeem the tax certificate since the proof of claim included a redemption statement prepared by the Camden City Tax Collector. Doc No. 34. She then guessed that, because she had purchased the certificate for less than the amount of taxes due, the objection concerned how much of the $76,454 should be paid to her versus paid to the City of Camden, as discussed in the New Jersey opinion that Mr. Izzo had attached, despite that Ms. Henriquez had acknowledged that issue and cited the opinion in her proof of claim.

At the hearing on the Motion to Reduce Claims, counsel for Ms. Henriquez and for the City of Camden appeared. Mr. Izzo failed to appear, while Tyrelle and Walter did. Though noting that Mr. Izzo's absence alone could allow the court to deny the motion for lack of prosecution, the

---

which shall not be so recorded . . . at the time of the filing of the complaint in such action shall be bound by the proceedings in the action so far as such property is concerned, in the same manner as if the person had been made a party to and appeared in such action, and the judgment therein had been made against the person as one of the defendants therein[.]

N.J.S.A. 54:5-89.1. He apparently could, but did not have to, apply to intervene. *Id.*

[11] The court could not find cases regarding the cram down of a property tax claim where there existed a non-debtor co-owner either, and Mr. Izzo did not supply any.

[12] If objecting to the amount of a claim as opposed to its validity, the proper relief is for the court to disallow it to that extent, not to strike the claim and force the claimant to file a new claim. *See* 11 U.S.C. § 502(a), (b)(1) (deeming proofs of claim allowed, unless an objection is made, and then allowing it "in such amount except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor . . . .").

court entered an order clarifying that the claim would be paid according to a response letter filed by the City of Camden explaining how the funds would be split between it and Ms. Henriquez. Doc. No. 52.[13]

This bankruptcy case was also marked by litigation over Ms. Henriquez's desire to depose Tyrelle and Greta. Ms. Henriquez filed a Motion to Compel in January 2022 after neither appeared for subpoenaed depositions. Doc. No. 19. Regarding Tyrelle, Ms. Henriquez's attorney had sent Mr. Izzo a letter dated January 6, 2022, scheduling the deposition for January 27, 2022, via Zoom. Doc. No. 19, ex. A. He emailed Mr. Izzo the day before the deposition to confirm it. Mr. Izzo replied that he "would prefer" another date due to his client's work schedule, which he had only just became aware of. *Id.*, ex. E. Ms. Henriquez's attorney did not agree to postpone. *Id.*, ex. F, p. 4. At the time of the deposition, Mr. Izzo stated that he was not producing his client. *Id*, ex. E. Greta did not appear for her deposition either, also scheduled that day. *Id.*, p. 4, ¶ 22. Mr. Izzo professed not to have a phone number or email address for her, despite having represented her in several deed transfers. *Id.*, ex. E.

Ms. Henriquez's counsel expended billable hours on this and the court reporter charged $130. *Id.*, ex. G. No opposition being filed to the Motion to Compel, the court granted it on February 22, 2022. Doc. No. 22.

On March 22, 2022, Greta filed a Motion to Vacate the sanctions order, arguing that she was legally entitled to transfer the property, her grandson was legally entitled to file bankruptcy, and that Ms. Henriquez's attorney's "sole intention of deposing me, [sic] is for intimidation; harassment; and infliction of emotional distress." Doc. No. 27, p. 2. However, she also opposed the motion on the ground that she was not served personally and stated that she had no knowledge of the purported deposition. *Id.*, p. 3. Ms. Henriquez filed opposition and a Cross Motion to Enforce and Award Fees, asserting that service was proper. Doc. No. 28.

The Motion to Vacate was heard on April 26, 2022, initially only with Ms. Henriquez's attorney appearing. Walter arrived later and informed the court that Mr. Izzo and Tyrelle were delayed due to Covid restrictions. Tyrelle never appeared. Greta never appeared. Nevertheless, the court vacated the enforcement order as to Greta as this court has previously ruled that service of a subpoena must be on the person, not by mail, certified mail, or, as here, accepted by a member of the person's household. Doc. No. 42. *See In re Williams*, BR 17-25034-ABA, 2021 WL 1912401, at *10 (Bankr. D.N.J. May 12, 2021).[14] But the court granted Ms. Henriquez's request for $520 in sanctions against Tyrelle for not appearing at the originally-scheduled deposition, allowed as an administrative priority to be paid from funds received by the chapter 13 trustee. Doc. No. 42. Mr. Izzo confessed that he had not even discussed the Motion to Compel to Enforce and Award Fees with Tyrelle, first stating that he thought the sanctions were only requested against Greta, then

---

[13] Based upon the value provided by Tyrelle, it appears that Ms. Henriquez may be paid the same from the cramdown funds as she would be if redemption were in full, thus the impact of the cramdown is really on the City of Camden. *See* Doc. No. 52, p. 3.

[14] It denied the Motion to Compel as it had not been served at Greta's correct address. Doc. No. 42.

stating that there were more substantive matters in the case to discuss with his client than this sanctions motion.

Ms. Henriquez then filed a new Motion to Compel Discovery. Doc. No. 44. Greta did not file opposition, but appeared with Walter at the May 31, 2022 hearing. The court explained to Greta that Ms. Henriquez had a valid reason to depose her, therefore she must submit to this. When the court asked Greta to provide a phone number or email address, as required of all persons filing documents with the court, *see* D.N.J. L.B.R 9004-1(b), so that the court had a means to contact her, Greta glanced first at Walker for approval. She then provided a phone number. The court then granted the motion. Doc. No. 51.

Regarding the Stay Relief Motion, at the April 26th hearing the court had directed Ms. Henriquez's counsel to file a brief by May 27, 2022, and Mr. Izzo to respond by June 10, 2022, with a hearing to be held June 21, 2022. Ms. Henriquez's attorney filed that brief timely. Doc. No. 46. Mr. Izzo did not file a brief at all. Instead, Tyrelle himself filed a certification with attachments, again "on my own cognizance, without the assistance and/or knowledge of my counsel in this matter. . . ." Doc. No. 50, ¶ 2.[15]

In her brief, Ms. Henriquez reasserted that there is no equity in the Decatur Property and it is not necessary for an effective reorganization. Doc. No. 46. The property is vacant, taxes have not been paid on it for more than a decade, and the tax liens are double the value of the property. Tyrelle never visited the property before buying one-half of it and does not live there. If he lost the property now, he would be relieved of an obligation to pay the $76,000 in taxes and be able to pay his other creditors in three months.

Ms. Henriquez conceded that section 1322(b)(2) permits cramdown of a claim secured by other than a debtor's principal residence but argued that section 1325(a)(3) and (7)—requiring good faith in proposing a plan and filing a petition—prevent confirmation of Tyrelle's plan. She argued that Tyrelle is not an honest but unfortunate debtor, noting all of the inconsistencies in his statements and suggesting that "[a]t best, [he] is a real estate speculator trying to have this [c]ourt make him money where he cannot do so on his own." Doc. No. 46-4, p. 12. "While there are many tools that can be used in an investor's arsenal, abusing the Bankruptcy Code under circumstances like these is not one of them," *id.*, she argued.

Finally, Ms. Henriquez argued that cramdown is improper with a non-debtor co-owner, citing cases holding that liens avoided as to a debtor's interest remain as to the non-debtor's interest. *See e.g., In re Hunter*, 284 B.R. 806, 813 (Bankr. E.D. Va. 2002) ("The debtor seeks to provide her with the benefit of having filed bankruptcy without her having borne the burden."). Though these cases concerned mortgages rather than property tax claims, she argued they were yet persuasive in this case involving a solely *in rem* lien and non-spouse co-owners. She argued that allowing a strip down to benefit a non-debtor would set a bad precedent, as parties could transfer title to others for no money yet receive the benefit of bankruptcy without the burden of filing

---

[15] Tyrelle first filed this certification on May 24, 2022, but it was missing one page. *See* Doc. No. 47. On May 27, 2022, he filed the complete document. *See* Doc. No. 50.

bankruptcy. She pointed out that section 506(d) only voids a lien that secures a claim "against the debtor."

In Tyrelle's "Second Supplemental Certification," he complained again about Ms. Henriquez's attorney failing in state court to note the transfer of ownership to Tyrelle. He argued that because he was not a party to the state court action, any orders there do not have claim preclusive effect as to him in this court.[16] He averred that any factual discrepancies raised by Ms. Henriquez in her brief "were the result of innocent mistakes by and/or miscommunications between Debtor and the latter's counsel, along with duress, harassment, and intimidated [sic] that Debtor suffered while being deposed. . . ." Doc. No. 50, p. 2, ¶ 3, citing ¶¶ 8, 9, 10, 11, 12, 13, 14, 20, 21, 22, 23, and 24 of Doc. No. 46. The listed paragraphs pertained to how much debt, income and expenses the debtor disclosed; that the debtor never visited the property before the deed transfer; debtor's certification that he filed bankruptcy due to the impact of Covid; and the debtor's assertion of an exemption on the property that only applies to a debtor's principal residence. *Id.*

Tyrelle admitted that his attorney "misstated" that Greta had adopted him; argued that his not living at the property does not preclude his right to bankruptcy relief as it pertains to the property; and asserted that he does in fact have a retainer agreement with Mr. Izzo. Tyrelle averred that Ms. Henriquez is "knowingly charging or attempting to exact fees or charges in connection with the redemption of [the tax sale certificate] that are more than the amounts permitted by chapter five of Title 54 of the Revised Statutes. . ." and attached an exhibit showing the redemption figure as of May 24, 2022. He argued that due to this, Ms. Henriquez has forfeited the tax sale certificate, pursuant to N.J.S.A. 54:5-63.1 (The court subsequently denied Tyrelle's objection to the claim. *See* Doc. No. 52.) Finally, Tyrelle again accused Ms. Henriquez's attorney of racial discrimination.

The court then closed the record and took the matter under advisement.

## IV.    DISCUSSION

### A. Stay Relief

Ms. Henriquez proceeds under section 362(d)(2), which provides:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—. . .
    (2) with respect to a stay of an act against property under subsection (a) of this section, if—
        (A) the debtor does not have an equity in such property; and
        (B) such property is not necessary to an effective reorganization[.]

---

[16] As stated in footnote 9, this assertion is not necessarily correct.

11 U.S.C.A. § 362(d)(2) (West).

As both parties recognized, Congress allocated the burdens of proof in litigating a stay relief motion as follows:

> (g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
>> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
>> (2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C.A. § 362(g) (West). Thus, Ms. Henriquez need only show that there is no equity in the Decatur Property; the burden then shifts to Tyrelle as to why the property is necessary to an effective reorganization. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375 (1988); *Bartucci v. O'Neil*, 64 Fed. Appx. 344, 346 (3d Cir. 2003). With an allowed claim more than double Tyrelle's proffered value of the Decatur Property, there is certainly no equity in this property. Thus, Tyrelle bears the burden of showing this court why it should not grant stay relief.

In determining whether property is necessary to an effective reorganization, the court is guided by the Supreme Court's *Timbers* decision.

> What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means, as many lower courts, including the en banc court in this case, have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time."

*Id.*, 375–76 (emphasis in original). "[L]ack of any realistic prospect of effective reorganization will require § 362(d)(2) relief." *Id.*, 376 (citing *Timbers Inwood Forest Associates, Ltd.,* 808 F.2d 363, 370-71 nn. 12-13 (5th Cir. 1987)). In other words, not only must the property be necessary to the debtor for him to reorganize, but he must be able to reorganize. *See Thomas v. U.S. Bank Nat. Ass'n*, CIV. 11-3417 FLW, 2012 WL 646056, at *3 (D.N.J. Feb. 28, 2012) (property not necessary to an effective reorganization because it was unlikely that the chapter 13 plan would be confirmed).

> "[W]hile 'a lift stay hearing should not be transformed into a confirmation hearing,' '[t]he effective reorganization requirement enunciated by the Supreme Court ... require[s] a showing by a debtor ... that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed.'"

*In re Fairfield Executive Associates*, 161 B.R. 595, 599 (D.N.J. 1993) (quoting *John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Associates,* 987 F.2d 154, 157 (3d Cir.1993), which was quoting *In re 266 Washington Associates,* 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992), *aff'd,* 147

B.R. 827 (E.D.N.Y. 1992)). *See In re Mullock*, 404 B.R. 800, 806–07 (Bankr. E.D. Pa. 2009) (same).

The court first notes that <u>nowhere</u> did Tyrelle address the confirmability of his plan. *See In re Askew*, 312 B.R. 274, 282 (Bankr. D.N.J. 2004) (citing lack of opposition to motion for stay relief as one reason supporting that property not necessary to any effective reorganization). Through the various replies to the Motion for Relief from Stay, Mr. Izzo and Tyrelle raised Malicious Abuse of Process, realty transfer fees, the CARES Act, whether Ms. Henriquez is owed the full redemption amount, and Tyrelle's intent to cure a default as evidencing a good faith filing. Doc. Nos. 15, 23. They denied engaging in a conspiracy, complained that Ms. Henriquez did not recognize Tyrelle's ownership in the state court action, asserted lack of claim preclusion, objected to the claim amount, accused Ms. Henriquez's attorney of perjury in the state court matter and of racial discrimination, and complained about being deposed. Doc. Nos. 40, 50. None of this speaks to whether an effective reorganization is in prospect, through a plan where Tyrelle is already behind on trustee payments. Thus, Tyrelle failed to meet his burden on this issue and the court could grant the stay motion solely on this basis.

But in addition, the court finds the amended plan unconfirmable. Tyrelle proposes to pay the $2,858 remaining owed to Mr. Izzo, $39,000 to Ms. Henriquez, and $0 to Bergen Square, totaling $41,858. The trustee's current percentage commission is 8.4%, adding $3,516 to the amount needed to be paid, for a total of $45,374. Thus, Tyrelle's plan is not confirmable on its face as his proposed payments only equal $42,363, $3,011 less than needed, without even getting to the plan's proposal to pay unsecured creditors pro rata despite having the disposable income to make a higher monthly payment.

Certainly, the chapter 13 trustee would object to the plan pursuant to section 1325(b), which would require Tyrelle to either (A) pay unsecured creditors in full or (B) pay all of his projected disposable income to be received in the applicable commitment period to pay unsecured creditors. 11 U.S.C. § 1325(b)(1). That disposable income is calculated from subtracting from the debtor's current monthly income "amounts reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor, . . .for charitable contributions . . . , and if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business." 11 U.S.C. § 1325(b)(2). Redemption of a tax sale certificate on investment property fits none of these categories.

> [Section] 1325(b) allows a debtor to maintain a reasonable lifestyle while simultaneously insuring that it makes a serious effort to fulfill its obligations to creditors, by eliminating unnecessary or unreasonable expenses. . . . If a debtor is not willing to make this type of commitment, it must either forgo bankruptcy relief or, subject to the limitations of § 707(b), seek relief under Chapter 7.

*Matter of Jones*, 119 B.R. 996, 1000–01 (Bankr. N.D. Ind. 1990) (internal citation omitted).

Tyrelle's net disposable income is at least $1,467, resulting in a total of $88,020 to be paid to creditors; more if the $657 in scheduled expenses that he testified he is not actually paying were added in. Neither paying unsecured creditors in full nor paying all of his projected disposable

income over 36 months exemplifes good faith because Tyrelle either would quickly pay creditors that have not been dunning him, or he would unfairly stretch payments over three years.

Greta's transfer of the property during the state court foreclosure proceeding also raises the specter of a bad faith filing by Tyrelle to stop the foreclosure, preventing confirmation pursuant to section 1325(a)(7) ("the action of the debtor in filing the petition was in good faith").

> "Good faith is fact intensive and requires a case-by-case analysis," determined by the totality of the circumstances. *In re Lilley*, at 496. When considering the totality of the circumstances, the court may consider
>
> > a wide range of factors, including, "the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors."
>
> *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007) (quoting *In re Lilley*, at 496).
>
> Finally, while filing bankruptcy during related state court litigation is not bad faith per se, it can be when "the purpose of the filing is to defeat state court litigation without a reorganization purpose." *Myers*, 125 (internal citation omitted).

*In re Eyde*, 21-17330-ABA, 2022 WL 412096, at *5 (Bankr. D.N.J. Feb. 10, 2022).

Here, Tyrelle seeks to pay debts that are not in arrears except for the property tax debt on a property he does not live in and only recently became a co-owner of. The bankruptcy case was filed just before the state court ruled on a Motion for Summary Judgment in the redemption foreclosure action. Tyrelle has stated that he filed due to financial pressures due to Covid, but later testified that Covid had no impact on his finances. He has stated that he filed to get a fresh start and improve his credit score, but he also testified that no creditors were pressuring him and he never presented anything to the court regarding his credit score. Moreover, purchasing a property with a $76,000 tax lien on it and then seeking to pay half that lien through a bankruptcy case is an unconventional way to improve one's credit rating, if it even would. Simple arithmetic shows that his proposed chapter 13 plan is unconfirmable. The inconsistencies in purported reasons for filing and the disclosure of expenses he does not have support that he has not been forthcoming with the court. His eleventh-hour suggestion that he wishes to live at the property—mentioned only in his deposition, not in any response filed with the court—supports that Tyrelle has no idea what he is doing or why, possibly guided instead by Walter, the person attending all the court hearings and paying Mr. Izzo. Tyrelle did not address any of these contradictions in his responses, despite having ample opportunity to do so. All of this supports a lack of good faith in filing, preventing confirmation as Tyrelle does not present as an "honest but unfortunate debtor[] that the bankruptcy laws were enacted to protect." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 374, 379 (2007) (internal citation omitted).

Regarding Tyrelle's assertion that cram down is permissible, the court notes first that Tyrelle cited no cases finding that one co-owner can cram down a lien in bankruptcy without the other co-owner involved. But the court need not determine this issue, as just the proposal to pay unsecured creditors pro rata to save investment property he recently bought, already immersed in debt, is not good faith. The discussion in *In re Amos*, 452 B.R. 886, 894 (Bankr. D.N.J. 2011), is persuasive:

> As outlined above, the Amoses' proposed plan seeks discharge of over $40,000 in unsecured debts, primarily credit card debts, without paying any dividend to the associated creditors, all while retaining the Poconos Property and devoting a substantial portion of their income to payments on that property. Further, the plan seeks to strip off a second mortgage of over $35,000, converting that debt to an unsecured claim, meaning that this creditor will also receive nothing. In sum, the Amoses propose to obtain a chapter 13 discharge of over $75,000 of debt, without repayment of any portion thereof, while paying more than $2,500 per month, over 60 months, towards non-essential property. The court finds this to be an abuse of chapter 13, which should serve as a repayment tool. *Ransom,* 131 S. Ct. at 727 (referencing the disposable income test's "overall purpose of ensuring that debtors repay creditors to the extent they can"). The architecture of chapter 13 is essentially a bargain, allowing debtors to keep property only by agreeing to make some meaningful payment to creditors. . . . For the payment to be meaningful, it should have some basis in a debtor's ability to pay. *See* [*Hamilton v.*] *Lanning*, [130 S. Ct. 2464,] 2476 [(2010)] (rejecting as "senseless" a statutory interpretation that "would deny creditors payments that the debtor could easily make").

> Here, the Amoses seek to retain a second house that they characterize as "investment property." Yet, by any reasonable measure, it is a poor investment. The property is underwater—it is worth approximately $22,000 less than the amount of the debt encumbering it. Furthermore, it produces only $170 in average monthly rental income while imposing monthly expenses of $125 in association dues and over $2,000 in mortgage payments, not including utilities and maintenance costs. Even worse, the mortgage on the property is over $26,000 in arrears. This property is simply not profitable; under normal circumstances, a prudent investor would be happy to surrender the property in exchange for a discharge of personal liability for the deficiency on the mortgage.

> Thus, the Amoses are being disingenuous in characterizing the property as an investment. . . . Whatever it is, it is neither an investment nor necessary to reorganization. While chapter 13 allows a debtor to retain property, the debtor must make a good faith attempt to repay creditors in order to justify this benefit. A plan such as the one proposed here has no place in chapter 13, which is a tool for reorganization and repayment of debts, not some sort of byzantine sport in which debtors can reap benefits, at the expense of creditors, by successfully navigating a maze of technicalities.

*In re Amos*, 452 B.R. 886, 894–95 (Bankr. D.N.J. 2011). *See In re Hamer*, 99-16601DAS, 2000 WL 1230496, at \*3 (E.D. Pa. Aug. 18, 2000) (stating that to be necessary to an effective reorganization, the debtor had the burden of showing that the if there is to be an effective reorganization, the premises would be needed for it); *In re Webster*, 93-14869-T, 1994 WL 841212, at \*2 (Bankr. E.D. Va. Sept. 23, 1994) ("Payment for investment property is not necessary for the maintenance or support of debtor."). *But see In re Smith*, 196 B.R. 565, 572 (Bankr. M.D. Fla. 1996) (finding retention of investment property not indicative of bad faith where debtor testified attempting to sell but had difficulty doing so, and all unsecured creditors were to be paid in full).

In criticizing Tyrelle for trying to save investment property, the court acknowledges that Ms. Henriquez's involvement with the property is also as an investor. However, though she did not pay the full amount of the taxes owed when purchasing the tax sale certificate, she did so pursuant to New Jersey statute that "authorize[s] the municipality to discount its accounts receivable in order to return the property to the paying tax rolls within a relatively short period of time[.] *Dvorkin v. Dover Twp.*, 29 N.J. 303, 313 (1959). Her investment actually aids the City of Camden fund itself, while Tyrelle's only burdened himself. The balance of equities—which investor should benefit—leans to Ms. Henriquez, who will receive a $35,000 property for $9,000 plus her costs, as opposed to Tyrelle, who would be relieved of some $39,000 in taxes plus interest through the cram down for a mere $1 investment.

Tyrelle also failed to address, much less prove, that the Decatur Property is "necessary" to this reorganization.

> The Bankruptcy Code's legislative history states that this requirement is intended to solve the problem of real property mortgage foreclosures where the bankruptcy petition is filed on the eve of foreclosure. The requirement is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity if the property is necessary to an effective reorganization of the debtor.

§ 16:179. *Requirement that property is not necessary to an effective reorganization*, 2 Bankruptcy Desk Guide § 16:179 (citing 124 Cong. Rec. H 11092, H 11093 (Sept. 28, 1978)). In other words, the stay should stay in place if the property is income-producing, but not if the debtor filed merely to delay foreclosure.

Examples of when property might be necessary to an effective reorganization include when it is necessary to a debtor's business operation, for producing income, or for personal reasons such as a car needed for transportation. *In re Patti*, 98-17719DWS, 1999 WL 223505, at \*3 (Bankr. E.D. Pa. Apr. 15, 1999). *See also In re Mesich*, 09-24910-GLT, 2014 WL 979188, at \*3 (Bankr. W.D. Pa. Mar. 12, 2014) (finding that allowing stay relief as to debtor's residence would "unduly disrupt" debtor's efforts to reorganize); *In re Van Horn*, 1:10-BK-07373MDF, 2011 WL 1900324, at \*7 (Bankr. M.D. Pa. May 19, 2011) (where plan funded by sale of property, property was necessary to reorganization); *In re Behanna*, 381 B.R. 631, 644 (Bankr. W.D. Pa. 2008) (failing business not necessary to reorganization); *In re Alberts*, 381 B.R. 171, 181 (Bankr. W.D. Pa. 2008) ("presumption in personal bankruptcies that a chapter 13 debtor's residence is necessary for an

effective reorganization when the purpose of filing for Chapter 13 is to retain possession of the debtor's home"); *In re Hamer*, 99-16601DAS, 2000 WL 1230496, at *3 (E.D. Pa. Aug. 18, 2000) (to prove residence is necessary for effective reorganization, debtor must present evidence that no comparable housing is available or that home is necessary to the debtor's business); *In re Moyer*, 42 B.R. 311, 312 (Bankr. E.D. Pa. 1984) (property not necessary to effective reorganization where debtor's plan did not rely upon generation of any income from his business or real property).

Rather than income-producing, the Decatur Property created a $76,000 expense for Tyrelle, with interest accruing at 18% throughout this case. *See* 11 U.S.C. § 551 (prohibiting cram down of tax claim interest rate). This property is not Tyrelle's residence. There was no suggestion that he is currently renovating it.[17] That Tyrelle might want to live at the property someday—an assertion at odds with Greta's certification that she transferred the property to him for estate-planning purposes—does not make it necessary to reorganization now. *In re Baratt*, CIV. 14-2933 FSH, 2014 WL 3900871, at *3 (D.N.J. Aug. 11, 2014) (saving a property from foreclosure does not make the property "necessary" to an effective reorganization). Tyrelle can get to his job to earn money to fund a plan whether or not he owns this property.

In addition, Tyrelle's lack of knowledge about the Decatur Property supports that the property is not necessary to him at all. As stated above, he had no idea of the value of the property, the taxes, or the foreclosure action before accepting the quitclaim deed Walter had Mr. Izzo prepare.

Tyrelle having failed to meet his burden of proof, stay relief is warranted.

### B. Dismissal

Ms. Henriquez requested as alternative relief dismissal of this bankruptcy case. A chapter 13 bankruptcy case may be dismissed for cause, including denial of confirmation of a plan and denial of a request for additional time for filing another plan or modification of a plan. 11 U.S.C. § 1307(c)(5). It also can be dismissed for bad faith. *In re Myers*, 491 F.3d 120, 125 (3d Cir. 2007); *In re Lilley*, 91 F.3d 491, 496 (3d Cir. 1996).

The Bankruptcy Court looks to the totality of the circumstances to determine bad faith, and may consider a wide range of factors, including, "the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors."

*In re Myers*, 491 F.3d at 125.

The totality of the circumstances of this case warrants a dismissal of the case. First, since Tyrelle never addressed this beyond a vague averment that paying the tax claim was a proper use of bankruptcy, the court could grant the relief as unopposed. Moreover, the filing only to frustrate the state court foreclosure process and/or reduce the tax claim on investment property, inconsistent

---

[17] In its boarded-up state, it might not even have a Certificate of Occupancy.

certifications, sloppy disclosures, posturing to thwart legitimate discovery efforts, and Tyrelle's lack of knowledge about the Decatur Property all described above, support dismissal of this case for bad faith.

But the court also finds that dismissal is merited, rather than as an alternative to stay relief, but because stay relief leaves just $5,000 in claims from creditors to be addressed in this case.[18] No creditors were demanding payment, and Tyrelle has the income to pay them within three months—there is no need for a bankruptcy case. Moreover, this court would neither confirm a plan lasting only three months nor confirm one that stretched this repayment over three years, as both being unacceptable uses of chapter 13 bankruptcy.

In the end, the court walks away with the impression from its own observations that Tyrelle does not fully understand why he is in bankruptcy or the events that purportedly lead to it. Some pleadings were inappropriate if not abusive. His or his attorney's attempts to explain things in most cases were lacking or hollow, unresponsive, irrelevant and/or unsupported by the facts or law. He is not pursuing this case in good faith and indeed, the court is not sure Tyrelle is actually "running the show" here. If he is, he has demonstrated nothing but a lack of good faith as set forth in all the preceding pages of this Opinion. If he is not, then this is not a valid bankruptcy purpose. The court will not tolerate such an abuse of the bankruptcy process.

### C. Sanctions

Ms. Henriquez also requested sanctions against Tyrelle and Mr. Izzo for her attorney fees and costs in litigating this bankruptcy case. An Order to Show Cause will be issued as a directive to Tyrelle and Mr. Izzo to show cause why these sanctions should not be imposed for filing this case in bad faith, to be added to the sanctions already granted for Tyrelle's failure to appear at the first-scheduled deposition.

### V.    CONCLUSION

Based on the foregoing, the Motion for Stay Relief and Dismissal of the case is granted. To the extent that Ms. Henriquez still seeks sanctions, an Order to Show Cause will be issued to consider any remedies.

An appropriate judgment has been entered consistent with this decision.

/s/ Andrew B. Altenburg, Jr.

---

[18] This counters any argument that this alternative relief was not obvious from the docket entry for the Stay Relief Motion (Doc. No. 12). Moreover, the court can raise dismissal *sua sponte*, 11 U.S.C. § 105(a); *In re Waring*, 555 B.R. 754, 758 (Bankr. D. Colo. 2016); *In re Falotico*, 231 B.R. 35, 42 (Bankr. D.N.J. 1999), and contrary to the 21-day notice required in chapters 7, 11 and 12, *see* Fed. R. Bankr. P. 2002(a)(4), the only notice necessary here is "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). There being no remaining valid purpose for this bankruptcy case due to stay relief being merited, no further notice or hearing is necessary.

Dated: July 28, 2022                United States Bankruptcy Judge